﻿Citation Nr: AXXXXXXXX
Decision Date: 06/16/20 Archive Date: 06/16/20

DOCKET NO. 190712-23345
DATE: June 16, 2020

ORDER

Entitlement to a total disability rating based on individual unemployability (TDIU) is denied.

FINDING OF FACT

The Veteran's service-connected disabilities, singly or in combination, are not so severe as to prevent him from obtaining and maintaining substantially gainful employment consistent with his level of education and occupational experience 

CONCLUSION OF LAW

The criteria are not met for entitlement to a TDIU. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 3.340, 3.341, 4.15, 4.16, 4.18, 4.19. 

 

REASONS AND BASES FOR FINDING AND CONCLUSION

In February 2019, the Veteran filed this claim for a TDIU. 

The Veteran selected the hearing lane when appealing the Regional Office’s (RO’s) decision denying this claim. See VA Form 10182 (Notice of Disagreement (NOD)). He testified in support of this claim during a March 2020 hearing before the undersigned Veterans Law Judge of the Board. Therefore, the Veteran had 90 days after his hearing to submit additional evidence and/or argument in support of this claim. Subsequent to the hearing, his representative submitted a statement affirming that Social Security Administration (SSA) records were not available. The Veteran had testified during his hearing that he had last worked in 2006 and had been receiving SSA benefits ever since, initially based on disability but now simply because of his age. VA has a duty to attempt to obtain SSA records, if relevant to the VA claim. See Golz v. Shinseki, 590 F.3d 1317 (Fed. Cir. 2010). But since, here, the Veteran’s representative already has affirmed that no SSA records are forthcoming, the Board is not making any additional attempts to obtain these records since this additional development would be futile. 38 C.F.R. § 3.159(c)(2).

The combined rating for the Veteran’s service-connected disabilities has been 70 percent for the entirety of the rating period on appeal; he also has had at least one service-connected disability rated as at least 40-percent disabling; thus, he meets the § 4.16(a) schedular rating requirements for a TDIU. 

The schedular rating criteria are designed to compensate for average impairments in earning capacity resulting from service-connected disability in civil occupations. 38 U.S.C. § 1155. “Generally, the degrees of disability specified [in the Rating Schedule] are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability.” 38 C.F.R. § 4.1. In other words, the disability rating, itself, recognizes that there is occupational impairment to some specified extent, depending on the schedular rating assigned for the service-connected disability. Therefore, to show additional entitlement to a TDIU, there must be occupational impairment above and beyond what is contemplated by the schedular rating assigned for the disability. 

In determining whether a Veteran is entitled to a TDIU, neither his nonservice-connected disabilities nor his age may be considered. See Van Hoose v. Brown v. Brown, 4 Vet. App. 361 (1993). The test of individual unemployability is whether the Veteran, as a result of his service-connected disabilities, alone, is unable to secure or follow any form of substantially gainful occupation which is consistent with his education and occupational experience. 38 C.F.R. §§ 3.321, 3.340, 3.341, 4.16. 

The Veteran has a high school education and two years of college. He has occupational experience as an aircraft maintenance specialist in service. Post service, he was employed with pest control (including in management), worked in a labor/landscape business, sold cars/ RVs/swimming pools, maintained a restroom for tips, and worked as a “pit dealer/pit boss” for a casino for two and a half years. 

The Veteran’s service-connected disabilities are thoracolumbar spine degenerative disc disease (DDD) with intervertebral disc syndrome (IVDS), rated as 40-percent disabling, chronic right rhomboid strain, rated as 10-percent disabling, bilateral (so left and right) lower extremity radiculopathy, with each lower extremity having separate 10 percent ratings for sciatic and femoral nerve impairment, and hemorrhoids, rated as 0-percent disabling, so noncompensable.

The claims file includes February 2019 correspondence, associated in electronic form with the clinical records, from Dr. J. J. This evidence reflects that “[a]fter a review of [the Veteran’s] records I am unable to state that [the Veteran] is individually unemployable.”

In April 2019, the Veteran sought to arrange for an electric wheelchair. It was noted that, in November 2018, he had been admitted to a hospital with encephalopathy that was thought to be secondary to opiates in combination with methamphetamine and cannibis. It was also noted that he had developed extreme left lower extremity weakness, the cause of which was unknown. 

 

An April 2019 VA Disability Benefits Questionnaire (DBQ) (completed by Physician’s Assistant, R.R.) reflects that the Veteran was in a wheelchair and that it was very difficult to perform an examination of him. He could not stand due to pain. The examiner indicated range of motion testing could not be performed because the Veteran reported increase in pain, fatigue, and weakness with repetitive use over time. It was also noted that he was “unwilling to attempt” walking or standing. As well, the examiner noted that performing most work duties requiring standing would be very difficult but that the Veteran could perform sitting activities. 

A May 2019 VA occupational therapy record shows the Veteran had been referred by Physician’s Assistant J.J. It was noted that the Veteran “reports that he cannot walk at all and that he uses a manual wheelchair loaned to him by a friend. The cause of his inability to ambulate is unknown”, but that he become [sic] unresponsive was taken to ICU where he remained unconscious for days before waking and being sent to rehab”. 

The Veteran and his spouse testified during the more recent March 2020 hearing before this Board that the April 2019 examination took less than 10 minutes, and that the examiner did not bother completing an examination when he saw that the Veteran was in a wheelchair. In written correspondence, the Veteran also stated that “there was no examination”, that it was less than five minutes, and that, when the examiner saw that I was in a wheelchair, he said “what’s the sense”. The Veteran also wrote that he was more than willing to stand if there was an examination but that he is unable to stand.

The Board, however, sees that this is not the first time that the Veteran has alleged that an examiner did not provide a proper examination. During a prior Board hearing in 2016, he complained about prior examiners who he alleged had slept during his examination and had played on their computers. 

 

Notably, though, during a prior 2012 VA examination, the examiner (Dr. D.S.) observed the Veteran had “interestingly, quite a bit of pain behavior and initially puts his foot on the knee and takes off the right sock but when the examiner looks up from typing then he uses the cane to take off the other sock, groans a lot, says his wife usually puts his socks on/off.” The examiner also observed the Veteran “claims to use the cane for the back but it seldom hits the floor by observation”. Finally, the examiner noted that the Veteran has “substantial pain behavior” and is “very deconditioned, he smokes and does not do much exercise and has a huge pain concept and likes his wife to help care for him.”

At a 2014 VA examination, a different examiner (Dr. K.C.) described that the Veteran’s spouse assisted him with removing shoes and socks as well as putting them back on. But the examiner added the Veteran walks to and gets onto the exam table unassisted and without his cane, but with somewhat of an ataxic gait. The examiner noted that the Veteran indicated his physical inabilities and that, on examination, demonstrated near total lack of motor strength of the lower extremities; however, this was “not physiologically compatible” with the observations when not being directly examined. Dr. K.C. found that the Veteran’s reported radiculopathies should be interpreted in the context of inconsistences, and that “one must consider whether effort, secondary gain, or other non-spine issues were present to account for inconsistencies.”

When reviewing these records, as a whole, the Board finds that the Veteran’s credibility regarding his symptoms in 2019 and 2020 is questionable. The Board also finds that the 2020 examiner’s finding that the Veteran was “unwilling” to stand and walk is persuasive as it is similar to the prior examinations and assessments indicating the Veteran was not dependable in discussing his symptoms and impairment and, at least in their estimation, tended to exaggerated them. Those prior examiners noticed stark differences in what he could do prior to them examining him (when under the impression he was not being watched) versus what he said he conversely could not do once they began their actual physical evaluations of him.

 

The Veteran testified during his recent March 2020 hearing that he “can’t really sit in a wheelchair” because its extremely painful and uncomfortable, that he has problems getting to the bathroom in time, and that he cannot concentrate and has poor memory due to a series of mini-strokes which he had in 2012. He is not in receipt of service connection for residuals of a stroke. The claims file does not include competent and credible evidence that his service-connected disabilities cause his urinary issues, memory problems, or concentration deficits. Moreover, although he is in receipt of service connection for hemorrhoids, the clinical records do not reflect recent complaints or treatment for such; thus, the evidence does not reflect that they are of such severity as to prevent him from sitting in a wheelchair. Although he is in receipt of service connection for chronic right rhomboid strain, the competent and credible evidence does not reflect that it would prevent working in sales, an area in which he has experience. He has reported that his right hand is weak, that he cannot hold things, and that he has carpal tunnel syndrome (CTS); however, he is not in receipt of service connection for right hand or CTS disabilities. He also has stated that he has left shoulder pain; but he is not in receipt of service connection for such.

In sum, the Veteran’s work history allows for him to have current employment despite his service-connected disabilities. Notably, he has had experience in working in occupations that do not require heavy manual labor and can reasonably be done in a wheelchair (e.g., management, sales, casino work). For example, he has worked for more than two years at a casino, including as a pit dealer; that work allows the employer to stay in one place to perform the tasks of dealing cards and collecting chips, even while seated. Moreover, as casinos must comply with federal law (e.g., the Americans with Disabilities Act (ADA)) for patrons, it is entirely reasonable that they would have sit-down table games, accommodations for wheelchair users to play, and aisles wide enough for wheelchairs to maneuver. As such, they would also allow for an employee to use a wheelchair (i.e., the Veteran could be a card dealer at a sit-down table). Finally, the work is not so intricate or highly specialized that the years since he last worked would adversely affect him (i.e., card games have not been shown to have changed that dramatically in the years since he last worked). In addition, he has sales experience.

The Board acknowledges that the Veteran’s service-connected disabilities can reasonably be expected to cause some symptoms and impairment. However, there is not competent and credible evidence to support the notion that they would preclude him from obtaining and maintaining substantially gainful employment. Notably, both R.R. and J. J. gave opinions ultimately against a finding that a TDIU is warranted, if only considering the functional impact of the service-connected disabilities. See Geib v. Shinseki, 733 F.3d 1350 (Fed. Cir. 2013).

For these reasons and bases, the preponderance of the evidence is against this claim, so the benefit-of-the-doubt rule is inapplicable, and this claim consequently must be denied. See 38 U.S.C. § 5107(b); 38 C.F.R. §§ 3.102, 4.3; Gilbert v. Derwinski, 1 Vet. App. 49, 54-56 (1990). 

 

 

KEITH W. ALLEN

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board T. Wishard

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.